HARMON v. SPRAGUE et al.

SPRAGUE et al. v. CORNER.

(Circuit Court of Appeals, Sixth Circuit. July 23, 1908.)

Nos. 1780, 1781.

1. INSOLVENCY—PREFERRED CLAIMS.

C., prior to the failure of a firm of brokers, ordered them to purchase certain stock for delivery. The purchase was made through another concern by the latter advancing the purchase price, in accordance with the usual custom, and charging the amount to the brokers' general account, retaining the stock in pledge. C. thereupon paid the brokers the amount due and requested that the certificates be transferred to him, but this was not done until the firm suspended, without having notified the purchasing brokers to transfer the stock to C., whereupon it was sold as a part of the pledge for the brokers' general account. Held, that such stock stock belonged to C., that the sale was wrongful, and that C. was therefore entitled to a preferred claim for the value thereof, against a balance remaining to the credit of the brokers on the sale.

2. SAME.

D. & Co., a firm of brokers, was ordered by H. to sell for him 20 shares of preferred Q. stock and to purchase 25 shares of G. Trust Co.'s stock. G. & Co. sold the Q. stock on the Chicago Exchange, realizing $2,057.50, in addition to commissions therefor, through another firm of brokers. The 25 shares of G. stock was purchased with commissions for $7,556.25, through another firm of brokers on the Cleveland Stock Exchange, and, both transactions being reported to H., he delivered to D. & Co. a certificate for the 20 shares of Q. stock and $98.75, which, with the proceeds of the Q. stock, he directed to be applied to the purchase of the G. stock, leaving a balance due D. & Co. of $5,400, which a trust company had agreed to pay to D. & Co. on delivery of the stock. On the sale of Q. stock, D. & Co. were credited with the selling price and charged with the stock, the charge being balanced by the delivery of the certificate, leaving D. & Co. credited on the books of their correspondent with $2,057.-50. The trust company's stock, however, was never delivered, and on D. & Co.'s failure the sale was canceled by their correspondent without loss, resulting in net credit to H. on D. & Co.'s books of $2,056.25. Held, that the purchase of the G. stock had never been consummated, and H. was therefore a mere creditor of D. & Co. at the time of their failure and was therefore not entitled to a preferred claim on the surplus arising from the sale of other pledged collateral belonging to D. & Co.

Severens, Circuit Judge, dissenting in part.

Appeals from the Circuit Court of the United States for the Northern District of Ohio.

C. F. Taplin and J. E. Morley, for W. F. Sprague and others.

F. L. Taft, for Frank S. Harmon.

T. H. Hogsett, for Horace B. Corner.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. On and prior to January 9, 1906, Finley, Barrel & Co. was a firm engaged in business as stockbrokers, in Chicago. At the same time, Denison, Prior & Co. were similarly engaged in Cleveland. The former firm was one of the correspondents of the latter, which bought and sold stocks for customers through it, carrying the same, where a direct purchase was not made, upon mar-

gins. On January 9, 1906, Denison, Prior & Co. failed, owing Finley, Barrel & Co., $146,913.68. To secure this, Finley, Barrel & Co. held 2,599 shares of the common stock of the American Ship Building Company, 1,885 shares of the preferred stock of the United Boxboard & Paper Company, 70 shares of the common stock of the United Boxboard & Paper Company, 50 shares of the common stock of the Quaker Oats Company, which securities, with the exception of 75 shares of the Boxboard preferred stock, which was delivered free, were on January 10, 1900, sold out, producing altogether $174,814.43. After paying the debt for which these stocks were pledged, Denison, Prior & Co. were left with a credit balance of $26,211.69, which was turned over to the receiver.

The contest is with respect to the distribution of this amount. Among the claimants were Horace B. Corner and Frank S. Harmon. Neither of these was a margin trader, doing business with Denison, Prior & Co., on a speculative account for the purchase and sale of stocks. Corner gave a straight order to Denison, Prior & Co. to purchase for him 50 shares of Quaker Oats common. This purchase was at once effected through Finley, Barrel & Co.; the latter advancing, in accordance with the usual custom, the purchase price, and charging the same to Denison, Prior & Co.'s general account, retaining the stock in pledge. On November 27, 1906, Denison, Prior & Co. presented to Corner a bill for the purchase price of the stock including commission, and stated that the stock had been purchased for it in Chicago. Corner paid the bill and instructed Denison, Prior & Co. to have the certificate transferred for him. This they agreed to do and receipted the bill. A few days thereafter, not having received the certificate, Corner asked Denison, Prior & Co. about the matter, and they informed him that the certificate had not been received, but that they would deliver it in a few days, as soon as it was received from the transfer office. Nothing was done by Corner until the time of the suspension of the firm of Denison, Prior & Co., and the certificate was not delivered to him. Denison, Prior & Co. had never notified Finley, Barrel & Co. to transfer the stock for Corner.

The claim of Frank S. Harmon grew out of the following facts: On January 4, 1906, he ordered Denison, Prior & Co. to sell for him 20 shares of the preferred stock of the Quaker Oats Company, and at the same time ordered the firm to purchase for him 25 shares of the Guardian Savings & Trust Company stock. That day the firm executed these orders in the following manner: By selling 20 shares of Quaker Oats preferred stock on the Chicago Stock Exchange, for $103 per share, realizing, after deducting commissions, $2,057.50. This sale was made through Finley, Barrel & Co. The purchase of 25 shares of Guardian Savings & Trust Company stock was made at $302 per share, which, with the commission added, made $7,556.25. This purchase was made on the Cleveland Stock Exchange from the firm of Wright, McLoud & Baker. Both these transactions were reported to Harmon, and on January 5, 1906, he delivered to Denison, Prior & Co. a certificate for 20 shares of Quaker Oats preferred, and at the same time paid them $98.75, which, with the proceeds of the sale of the Quaker Oats stock, he directed to be applied on the purchase price of the

Guardian Savings & Trust stock, thus leaving a balance due Denison, Prior & Co. of $5,400, and it was then agreed that Denison, Prior & Co. should deliver the shares of the Guardian Savings & Trust Company stock to the Citizens' Savings Trust Company, with which company Harmon had an arrangement whereby the bank was paid the balance of $5,400, on the delivery of said Guardian Savings & Trust Company stock. Upon the sale of the Quaker Oats stock, on January 4, Finley, Barrel & Co. credited Denison, Prior & Co.'s account with the selling price thereof, and charged their account with the stock so sold. Denison, Prior & Co. transmitted the certificate of Quaker Oats preferred stock delivered to it by Harmon to Finley, Barrel & Co., which firm on receipt of the certificate on January 9, credited Denison, Prior & Co.'s account with the stock so received, making the net credit on account of the transaction $2,057.50. On the 9th of January, the books of Denison, Prior & Co. showed Harmon to be owing said firm the sum of $5,400, and that the firm were carrying for his account 25 shares of the Guardian Savings & Trust Company stock; that Denison, Prior & Co. did not pay Wright, McLoud & Baker any part of the purchase price of the 25 shares of the Guardian Savings & Trust Company stock; that at the suspension of Denison, Prior & Co., on January 10, 1906, said shares of stock were still in the possession of Wright, McLoud & Baker, and were held by that firm subject to the rules of the Cleveland Stock Exchange, which provide that, on the suspension of a member of the exchange, the sale shall be closed out, and any deficiency resulting therefrom shall be a lien on the seat of the firm so becoming insolvent. Instead of closing out the sale, the same was canceled, and no loss resulted to Denison, Prior & Co., and no charge was made against the seat of the firm on the Cleveland Stock Exchange. In closing out Harmon's account, Denison, Prior & Co. credited him with the sum of $7,556.25, leaving Harmon as a net credit, $2,156.25.

The master found with respect to these claims that neither Corner nor Harmon was entitled to any preference over the other creditors. The court below sustained this holding as to Harmon, but took the view that Corner's claim stood by itself, that he had made a straight out purchase of the 50 shares of Quaker Oats stock, the stock was bought and identified, that Denison, Prior & Co. made out a bill for its price with commission, and that Corner paid this and was entitled to the certificate. The stock therefore became and was his, and its sale as collateral pledged, under the general agreement to secure Finley, Barrel & Co.'s account, was wrongful. Accordingly, the court took the view that Corner was entitled to receive out of the fund the entire proceeds of the sale of 50 shares of Quaker Oats stock which belonged to him. With respect to the claim of Harmon, the court took the same view the master did, that he was not entitled to participate in the fund.

We agree with the view taken by the court below of the Corner claim. It seems to be simply a case of following and identifying the proceeds of a sale of stock which belonged to Corner and should have been delivered to him instead of being sold. The rule in following and identifying trust funds is defined in the recent case of Board of Commissioners of Crawford Co. v. Strawn, 157 Fed. 49, 84 C. C. A. 553.

That states the law of this court upon the subject. The law regulating brokers and customers, and governing the relations which result from the purchase and sale of stocks, either directly or on margin, is discussed by the Supreme Court of the United States, speaking by Mr. Justice Day, in the recent cases of Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, and Thomas v. Taggart, 209 U. S. 385, 28 Sup. Ct. 519, 52 L. Ed. 845. It is unnecessary to go into any extended discussion or consideration of the present case which has no features distinguishing it from others of a like character. The stock was bought on the order of the Cleveland brokers, by the Chicago firm, for Corner, and was paid for by him; the bill being sent him by the Cleveland firm. When this was done, the stock belonged to Corner, and the certificate should have been sent him; but the Cleveland firm failed to do so, and, as a result, the stock was sold upon their failure, as collateral to satisfy the account of the Chicago brokers against them. We think this was done wrongfully. Corner owed neither the Cleveland firm nor the Chicago brokers anything, and consequently the proceeds of Corner's stock, which went into the fund at the sale, should go to him.

As to the claim of Harmon, who was so unfortunate as to have the proceeds of the Quaker Oats stock, sold by the Chicago firm, go to the credit of the Cleveland brokers just about the time they became insolvent, the Cleveland brokers had received Harmon's order to sell the Quaker Oats stock and then purchase 25 shares of the Guardian Savings & Trust Company stock. They, accordingly, gave the necessary instructions to carry out these orders; but the program was never completed. The Chicago correspondent sold the Quaker Oats stock and credited the account of the Cleveland brokers with its proceeds. The Cleveland brokers meantime had given instructions to a Cleveland firm dealing on the Cleveland Exchange to purchase the 25 shares of the Guardian Savings & Trust Company stock, and the arrangement was made that upon receiving the proceeds of the Quaker Oats stock, with a small additional sum, a Cleveland bank would advance $5,400 on the 25 shares of the Guardian Savings & Trust Company stock. This, however, was not done, because of the failure of Denison, Prior & Co. The proceeds of the sale of the Quaker Oats stock, $2,057.50, with the amount paid them by Harmon, $98.75, making altogether $2,156.25, standing on the books of Denison, Prior & Co. to the credit of Harmon, not being available for the purchase of the 25 shares of the Guardian Savings & Trust Company stock, the sale of the latter was canceled, and no loss resulted to Denison, Prior & Co. During the interim, the proceeds of the sale of the Quaker Oats stock were held by Denison, Prior & Co. as a credit for that amount, and stood there at Harmon's risk. The firm did what it could to carry out the instructions given by Harmon, but before it could do so the failure came, and that put Harmon in the condition of any other creditor; the purchase of the 25 shares of the Guardian Savings & Trust Company stock not having been consummated.

The fund for distribution here arose from sale of stocks owned by original purchasers, and they only are entitled to share in the surplus

remaining after satisfaction of the debt for which they had been pledged by Denison, Prior & Co. None of the shares so included in the pledge belonged to Harmon. He has failed therefore to show any right to be paid out of or share in the fund in the receiver's hands.

Decree affirmed.

SEVERENS, Circuit Judge, dissents as to disallowance of the Harmon claim.