## In re ROSENBAUM GRAIN CORPORATION.

### No. 59666.

District Court, N. D. Illinois, E. D.

Dec. 22, 1936.

Johnson, Swanstrom, Wiles & Clawson, of Chicago, Ill., for trustee.

Lederer, Livingston, Kahn, Adler & Adsit, of Chicago, Ill., for petitioner.

HOLLY, District Judge.

On the 23d of April, Rosenbaum Grain Corporation filed its petition under section 77B of the Bankruptcy Act, as amended (11 U.S.C.A. § 207), and on that date the petition was approved and a trustee appointed.

Rosenbaum Grain Corporation, prior to the 23d day of April, 1935 (the date of the filing of its petition under section 77B of the Bankruptcy Act, as amended), was engaged inter alia in the business of grain and stock brokerage and maintained branch offices in various cities throughout the United States. Marian K. Livingston, the claimant, a resident of Bloomington, Ill., desired to sell 25 shares of F. W. Woolworth & Co. stock and directed her husband, as her agent, to go to the Bloomington office of the Rosenbaum Grain Corporation to have said stock sold for her at a specified price. The Bloomington office of the Rosenbaum Grain Corporation wired instructions to the principal office in Chicago and it was agreed that the Rosenbaum Grain Corporation would execute the order to sell and would immediately transmit a sum equal to the proceeds therefrom to the claimant upon the delivery by her of the certificates of stock. Rosenbaum Grain Corporation then turned the order over to Rothschild & Co. to sell said stock and Rothschild & Co. forwarded the order to sell to Harris Upham & Co., who sold the stock on the New York Stock Exchange for $1,403.13, and after deducting their usual fees, commissions, and taxes, there remained the net sum of $1,396.95 as the proceeds from the sale of the F. W. Woolworth & Co. stock. The claimant had no knowledge that Rosenbaum Grain Corporation would execute this sale through Harris Upham & Co. Subsequently thereto,

claimant delivered said shares of stock to the Bloomington office of the Rosenbaum Grain Corporation, and it was delivered by it to Harris Upham & Co. on the 23d day of April, who then credited the account of Rosenbaum Grain Corporation with the net sum realized. At the close of business on the date of the sale of said stock Rosenbaum Grain Corporation was indebted to Harris Upham & Co. in the sum of $27,381.71, together with an interest item of $59.75, and prior to the close of business on that date Harris Upham & Co. credited the account of Rosenbaum Grain Corporation with the sum of $3,593.72, which sum included the proceeds from the sale of 25 shares of Woolworth stock, along with proceeds of other transactions.

On April 23, 1935, Harris Upham & Co. had in its possession various securities delivered to it by Rosenbaum Grain Corporation under a pledge to secure the above indebtedness, namely, $27,441.46, and on April 24, 1935, the pledged securities were sold for the total sum of $51,982.48, from which sum was deducted the amount due and owing by Rosenbaum Grain Corporation to Harris Upham & Co., and the net amount of $22,252.66 was remitted to the trustees of Rosenbaum Grain Corporation and is now held by them.

The claimant received a dividend in the sum of $15 which was declared payable on June 1, 1935, to holders of record on April 23, 1935.

The master found that the claimant was entitled to a preference. The trustees objected to the finding, their objections were overruled, and they thereupon entered their exceptions to the report at the time it was filed with this court.

It is conceded by counsel for the trustee that when the debtor understood to sell the shares of stock of petitioner, it became her agent and that a fiduciary relationship between the debtor and petitioner was thereby created. But, the trustee argues, upon the sale of the stock the relationship changed, and thereafter the debtor no longer occupied the position of a trustee, but only that of an ordinary debtor, that to constitute a trust "there must be a subject matter, that is a res, and unless it appears there is such a res no trust relationship can be imposed upon any of the parties." Further, counsel says, "That when the claimant directed Rosenbaum Grain Corporation to sell her shares of stock for her, she did not in fact contemplate or expect that the identical moneys received by Rosenbaum Grain Corporation from the sale of this stock to third persons would or should be returned to her." With this statement of fact there can be no disagreement. I cannot agree, however, that because petitioner did not expect the identical moneys received by Rosenbaum Grain Corporation to be turned over to her, that the trust relation created when the stock was turned over to them ceased to exist when the stock was sold.

Counsel for the trustee, to sustain their position, rely chiefly upon two cases, Harmon v. Sprague (C.C.A.) 163 F. 486, and Jennings v. U. S. Fidelity & Guaranty Co., 294 U.S. 216, 55 S.Ct. 394, 79 L.Ed. 869, 99 A.L.R. 1248. The facts in those cases, however, were quite different from the facts in the case at bar. In Harmon v. Sprague, supra, Harmon ordered the D. Company, brokers, to sell shares of Quaker Oats stock and buy certain trust company stock. The price of the latter stock was much in excess of the amount that would be received for the Quaker Oats stock, and it was agreed that the D. Company should deliver the trust company stock to a bank which would pay the balance due. The D. Company sold the Quaker Oats stock through another brokerage house which credited D. Company with the amount due on the sale. The D. Company purchased the trust company stock through still another broker, but did not pay for the same, and at the time of the failure of the D. Company, January 9, 1906, the latter stock was still a possession of the broker through whom it was purchased. These transactions had been reported to Harmon and he had delivered his Quaker Oats stock to the D. Company on January 5. On the day before the failure of the D. Company, its books showed Harmon to be indebted to it in the amount of the difference between the sale price of the Quaker Oats stock and the purchase price of the trust company stock, and that the company was carrying for him the trust company stock. In closing out Harmon's account, the D. Company credited him with the purchase price of the trust company stock, leaving him a net credit in the amount of the sale price of the Quaker Oats stock, the transaction with the broker who bought the trust company stock having been canceled by that firm on learning of the failure of the D. Company. Harmon filed his claim with the receiver of the D. Company, taking the position that he was a preferred creditor. The court held that the purchase of the trust company stock not having been completed and only a part of

the purchase price having been turned over to the D. Company, Harmon stood in the same position as any other creditor. It should be observed that in this same case the court had to pass upon the claim of one Corner who had given an order to the D. Company to purchase shares of stock for him. The D. Company ordered the stock through other brokers who advanced the money to make the purchase, charging the D. Company's account with the amount of the money advanced, retaining the stock as collateral. The D. Company presented a bill to Corner for the purchase price of the stock and commission. Corner paid the bill and instructed D. Company to have the stock certificate transferred to him. The D. Company suspended operations before this was done. The brokers who had purchased the stock for the D. Company sold it to satisfy their claim. The court held that Corner was entitled to an order on the trustee to have his claim paid in full out of the assets of the estate. So far as the question of the relationship between Corner and the D. Company is concerned, that case seems to be on all fours with the case at bar.

In Jennings v. United States F. & G. Co., 294 U.S. 216, 55 S.Ct. 394, 79 L.Ed. 869, 99 A.L.R. 1248, supra, a check had been sent to a bank in Indiana for collection. It collected, as it might do under the Banking Code of that state, by setting off through a clearing house, checks held by it drawn on other banks against checks drawn upon it. The outcome was a small debit balance against it which it settled the next day. It remitted to the forwarding bank from which it had received the check its draft for the amount of this check and other items, but before this draft had been honored the collecting bank had closed its doors. The court held, in accord with the general rule on the subject, that when a collecting bank has collected the relation between it and the person who gave it the check for collection is that of debtor and creditor. This rule is based upon the usage in business and banking circles (Freeman's Nat. Bank v. National Tube-Works, 151 Mass. 413, 418, 24 N.E. 779, 8 L.R.A. 42, 21 Am.St.Rep. 461) and does not apply to the case of an individual or corporation, other than a banking corporation, which acts as agent for collecting moneys due the principal.

In the present case, had Rosenbaum Grain Corporation itself sold petitioner's stock and received the proceeds there could be no doubt, I think, that the proceeds would be held in trust for petitioner. Markham v. Jaudon, 41 N.Y. 235, Richardson v. Shaw, 209 U.S. 365, 28 S.Ct. 512, 52 L.Ed. 835, 14 Ann.Cas. 981, Larrabee v. Badger, 45 Ill. 440. The circumstance that the sale was made through Harris Upham & Co., there being a balance due from that concern to Rosenbaum Grain Corporation after the sale of the Rosenbaum collateral and payment of the indebtedness of Rosenbaum Grain Corporation to it of an amount greater than the sale price of petitioner's stock, does not, in my opinion, alter the legal situation.

One further question remains for discussion. Has petitioner sufficiently traced and identified the proceeds of the sale of her stock?

On April 23, 1935, the stock of the petitioner was delivered by Rosenbaum Grain Corporation to Harris Upham & Co. who sold it and credited Rosenbaum Grain Corporation with the net sum realized. At the close of business that day after it received credit for said sum, Rosenbaum Grain Corporation was indebted to Harris Upham & Co. in the sum of $27,381.71, plus a small amount of interest. On the next day, Rosenbaum Grain corporation having filed its petition herein under section 77B of the Bankruptcy Act, Harris Upham & Co. sold certain securities of Rosenbaum Grain Corporation which it held as collateral, realizing therefor the sum of $51,982.48, and after deducting the amount due it from Rosenbaum Grain Corporation, remitted the balance $22,252.66 to the trustees of Rosenbaum Grain Corporation. The result to the estate, therefore, is exactly the same as it would have been had the Rosenbaum Grain Corporation itself sold the stock of petitioner for cash. The estate was augmented by the amount of the sale price of the stock. Where a collecting agent applies trust funds on an indebtedness owing to it by the insolvent forwarding agent, but also holds certain collateral pledged by the latter as security for the debt, any portion of such collateral or its proceeds which comes to the hands of the legal representatives of the insolvent may be impressed with the trust. Bartholf v. Millett (C.C.A.) 22 F. (2d) 538; Dudley v. Richards (C.C.A.) 18 F.(2d) 876; Gwynn v. Spurway (D.C.) 28 F.(2d) 37. And see Temple Law Quarterly 11, November, 1936. The author of that article cites the case of Hoffman, Receiver of Rauch Adm'r [Rauch v. Hoffman, 85 F.(2d) 1000], decided by the Cir-

cuit Court of Appeals for the Third Circuit, Oct. 9, 1936. In that case A had deposited bonds with a bank for safe-keeping. The bank wrongfully sold these bonds to its depositor B and debited B's account with the sale price. No money was received by the bank, but the court held that there had been augmentation of the assets of the bank.

Petitioner is, therefore, entitled to be classed as a preferred creditor. The exceptions to the report of the referee will be overruled and the report approved.