### In re H. B. HOLLINS & CO.

#### (District Court, S. D. New York. March, 1914.)

1. BANKRUPTCY (§ 140*)—STOCKBROKERS—RATABLE DISTRIBUTION OF STOCK.
   Where stockbrokers, who had purchased stock for several customers and who had charged themselves with the stock as "long" on their books and had notified the customers, became bankrupt, each customer was entitled as against the general creditors to such proportion of the stock in the possession of the brokers at the time of the bankruptcy as the shares which the brokers should have held for his account bore to the total amount of the shares which should have been in their possession, in case

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the amount of shares on hand was less than the number of shares required to satisfy all the customers in full.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. § 140.*]

2. BANKRUPTCY (§ 154*)—STOCKBROKERS—RATABLE DISTRIBUTION OF STOCK—SET-OFF.

Where the shares on hand were less than the amount required to satisfy the demands of the customers, any customer indebted to the brokers could set off his indebtedness against the shares not recoverable.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 451–455; Dec. Dig. § 154.*]

In Bankruptcy. Proceeding against H. B. Hollins & Co., bankrupts. On petition of Arthur B. Duel for the distribution and apportionment to himself and others entitled to 100 shares of the stock of the Amalgamated Copper Company in the possession of the receiver of the bankrupts. Relief granted.

See, also, 210 Fed. 965.

Hollins & Co. (hereinafter called Hollins) were stockbrokers, and went into bankruptcy November 13, 1913. On October 13, 1912, the petitioner Duel employed them to purchase for him 100 shares of the stock of the Amalgamated Copper Company (hereinafter referred to as "Copper"). They did so and actually received certificates for that amount. These certificates Hollins disposed of before bankruptcy; how or to whom is not known. On October 25, 1912, one Bamberger likewise employed Hollins to purchase 30 shares. They did so, received the stock, and shortly thereafter pledged the same with the consent of Bamberger, but for their own benefit, with the National Bank of Commerce. On the 25th of February, 1913, Wiener, Levy & Co. (hereinafter called Wieners) employed Hollins to purchase 50 shares of Copper. The customers were notified that purchase had been made, and Hollins charged themselves with the stock as "long" on their books. It is alleged, and not denied, that on or about June 13, 1913, the 50 shares so bought passed out of the control of Hollins "for and in behalf of another customer."

At a date not shown, but prior to November 1, 1913, Hollins by their books appear to have purchased 100 shares of Copper for one Hugo Landau, and also by their books they asserted themselves to be in possession of this stock as "long" for Landau's account. At the close of business November 7, 1913, the books of Hollins show them as responsible for 280 shares of Copper, in the following proportions, viz.: Bamberger, 30; Duel, 100; Wiener, Levy & Co., 50; Landau, 100. But they had in possession only 100 shares. Bamberger's 30 shares were, as above noted, pledged to the National Bank of Commerce; but for which particular customer the 100 shares were held does not appear and cannot be ascertained. It follows that Hollins had apparently already converted 150 shares (100 Shs "in box," 30 Shs with National Bank of Commerce by Bamberger's consent, leaving 150 Shs missing).

On November 8, 1913 (a Saturday), one Schatzkin ordered Hollins to sell for his account 200 shares of Copper "short," and this was done. On the next business day, November 10th, it was obligatory to make a delivery pursuant to the short sale, and delivery was made by Hollins surrendering the 100 shares held as above for "account of their long customers," together with another 100 shares borrowed by Hollins for that purpose. On the same November 10th Schatzkin ordered his brokers to "cover" the short sale, which was done by buying 200 shares "on the market." This necessitated a stock exchange clearing house operation, as the result of which the borrowed shares were returned to the lender, and the 100 shares previously delivered were replaced by another 100 shares in different certificates which Hollins received from another brokerage house on November 11th. It is thus proven that 100 shares which on November 7th Hollins & Co. had for account of

their "long" customers were used to make deliveries under "short" orders. On the day of failure the bankrupts continued to be liable as above noted for 280 shares of the stock in question, but they had in possession no more than the 100 shares now in the receiver's hands, the certificates for which had come to them two days before as the result of the Schatzkin speculation.

Transactions in "Copper" were not the only pieces of business transacted between the bankrupts and the persons heretofore enumerated. On November 13th Landau's account showed him indebted in the sum of $10,175.92, with certain securities, including the Copper stock in question, held as security therefor. This account has been liquidated by the receiver, so far as appears, with Landau's consent, i. e., he has been credited with the values on the day of failure of the stocks held, so that on the papers before me they are gone, and Landau is still indebted to the bankrupt estate in the sum of $375.92. Bamberger was in the same condition, and the receiver has credited him with the values of his stocks on the day of failure, including the 30 shares of Copper known to be in the possession' of the National Bank of Commerce. By the account submitted Bamberger's interest in that stock has been wiped out by consent, and he has become a creditor of the bankrupt estate for $221.55. Wieners were in the same position on the date of failure, i. e., they were heavily indebted, and numerous stocks (including the Copper) were held by Hollins as security. The receiver in like manner has offered to liquidate this account. If the same principles were applied there would result a balance in favor of Wieners of $3,227.78, and the receiver is willing that they should be considered creditors for that sum. Wieners, however, in their answer, in effect decline to assent to liquidation; they accept it only as far as necessary to wipe out their debit balance, so that their account, as stated in the answer, shows the appropriation of all collateral except the fifty shares of Copper, with the result that as of November 13, 1913, Wieners are indebted to the estate in only $290.97, while the estate is still responsible for the 50 shares of Copper. From the papers before me it does not appear that any effort has been made to liquidate the account of Duel. In the account rendered him by the bankrupt as of November 1, 1913, he is shown to be in debt to Hollins in the sum of $3,326.01, as against which the aforesaid 100 shares of Copper is held as security. "Copper" was quoted on November 13, 1912, at 70⅛, on which basis the liquidations referred to were made. Under these circumstances Duel petitioned for an allotment to him of 100-280 of the Copper stock the receiver has in hand. Notice was given to all the other persons interested in Copper stock on "long" transactions, and Wieners appeared and claim 50-280 thereof. Landau has not appeared, though duly notified. Bamberger submitted his rights, claiming whatever relief was accorded Wieners.

Hawkins, Delafield & Longfellow, of New York City (Frederick W. Longfellow, of New York City, of counsel), for petitioner.

Cravath & Henderson, of New York City (Stuart McNamara, of New York City, of counsel), for Wiener, Levy & Co.

Stroock & Stroock (Henry L. Moses, of New York City, of counsel), for L. M. Bamberger.

Lexow, Mackellar & Wells, of New York City (T. Tileston Wells, of New York City, of counsel), for receiver.

Beekman, Menken & Griscom, of New York City (William C. Armstrong, of counsel), for bankrupts.

HOUGH, District Judge (after stating the facts as above). [1] This claim is the legitimate aftermath of Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047, if that decision logically follows Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981, and Sexton v. Kessler, 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995. That there is such logical sequence Justice Day's opin-

ion asserts, and it seems to me plain enough. All these controlling cases fully accept the "grain elevator" doctrine respecting stocks, so that a customer who finds any stock of the kind he bought on his broker's premises can claim what he finds, for it is "unnecessary * * * to put his finger on the identical certificates purchased for him." This right is helped out by that "presumption in favor of fair dealing" so much dwelt on in the higher courts, though said presumption is productive of cynic smiles even in counsel advancing the same in courts nearer real life—as it is seen in stockbrokers' shops.

Putting together these controlling fictions, it is difficult to see what exclusive right any customer can have in any given certificate until he gets it in possession; but that claim still awaits decision. If there were 280 (or more) shares of Copper in the receiver's hands, the Gorman Case would be plainly applicable; but there are only a hundred, and that fact is said to entail both a difference and distinction. It is true that Day, J., twice refers to the presence of shares sufficient to satisfy the demand of the petitioner Gorman—as if that fact were significant. It was significant, after the fictional presumption had been made, that what the brokers had on hand was acquired because they intended to replace the misappropriated shares of Gorman. If they were going to replace any shares, acquiring the exact amount taken is quite significant of intent to make good the wrong done. But if by dwelling upon number of shares on hand anything more than this was meant, the logical symmetry of the fictions on which the decisions rest is seriously impaired, to say the least. If stock purchasers dealing in a given stock at a given broker's are entitled to regard his aggregate purchases as so much grain in a bin (at least until he allots the stock in specie, if there is such a thing), and if they are entitled to presume that when he wrongfully takes from the bin, any subsequent acquisition of "stock-grain" is intended to fill up the bin again, what difference can it make that, when the broker is surprised by bankruptcy the bin is full, or half full, or as here, 10-28 full?

Again it was urged that Gorman's Case did no more than relax the rules of identification. Gorman was refused any stock in this court, because he could not identify as his the stock on hand, but the very ground of decision in the Supreme Court is that no identification is necessary—the presumption of restitution plus the physical presence of some stock, supplies the lack—"in the absence of countervailing proof." To call what occurred in Gorman's Case identification is playing with words. Nor is there here any countervailing proof. Indeed, this record is more favorable to Hollins' customers in Copper than was the evidence in Gorman's Case. It is uncontradicted that on November 7th Hollins had on hand 100 shares "for account of their long customers." They were used to "carry" Schatzkin. That they emerged from that transaction in different certificates, but unchanged in their relation to Hollins, needs no exposition in a community much too familiar with transactions such as have here been outlined.

In short, if one deals with facts instead of fictions, it is true that any customer who had applied for his Copper before bankruptcy would have gotten these 100 shares, or the proper part thereof. The effect

of bankruptcy is that all apply together, and so all must share pro rata. Landau's account has been liquidated and he is still in debt, therefore he has no claim. Bamberger's situation is interesting but microscopic. It is known exactly what became of the paper called a certificate which Hollins purchased for him. The pledge was lawful and consented to. Bamberger never paid for that stock, unless the receiver's liquidation is payment. Unless he somehow pays he can get nothing. The receiver's liquidation does not suit counsel, even partially; perhaps because it may deprive Bamberger of rights against any surplus in the Bank of Commerce loan. As Bamberger will not come upon this fund on the only basis admissible, he is relegated to his rights elsewhere.

[2] Duel may recover 35.714 shares and Wiener 17.857 shares. Their several indebtedness may be set off against the shares not recoverable. The fractional shares must be adjusted in cash at 70⅛.