In re KARDOS et al.

Circuit Court of Appeals, Second Circuit.
July 9, 1928.

No. 356.

1. Bankruptcy ⬅️140(8)—Claimant, depositing bonds as margin with bankrupts, held not entitled to preferred claim, where bonds were repledged before claimant began trading, and later surrendered.

Where claimant delivered bonds to brokers, later becoming bankrupt, as margin for trading account, and brokers converted bonds by repledging them before claimant began trading operations, and bonds were surrendered to receiver in bankruptcy after bankruptcy proceedings were commenced, claimant held not entitled to preferred claim to redelivery of her bonds.

2. Bankruptcy ⬅️140(8)—Facts showing sales of stock by brokers, where no deliveries were made, were nullities.

In bankruptcy proceeding, facts held to show that sales of claimant's stock by brokers, later becoming bankrupt, where no deliveries were made, were nullities.

3. Bankruptcy ⬅️140(8)—Claimant delivering stock to bankrupts to be sold could reclaim proceeds of sale traced into certain account, where another purchase was not made as directed.

Where claimant delivered stock to brokers, later becoming bankrupt, to be sold, with instructions to purchase other stock, and brokers did not make sales in fulfillment of orders, but turned stock over to other brokers, who sold same for account of bankrupts, and bankrupts did not purchase other stock as directed, claimant could rescind contract for failure of performance, and reclaim proceeds of sale which were traced into account of bankrupts with trust company, since proceeds of sale could only be used to purchase other stock, and, whether sales through the other brokers were regarded as made under claimant's order or as wrongful conversion, proceeds were his in either event.

4. Bankruptcy ⬅️140(8)—Claimant, directing bankrupts to purchase stock, held entitled to preferred claim, where bankrupts purchased stock through other brokers, but did not pay for same.

Where claimant directed brokers, later becoming bankrupt, to purchase stock, and brokers purchased same day through other brokers, but did not pay the other brokers, who were carrying this and other securities for their account, and claimant sent check the same day that Stock Exchange deliveries were ordinarily made, and the other brokers, in liquidating their account with bankrupts, sold stock and turned over proceeds and other cash and securities which survived liquidation to receiver in bankruptcy, claimant held entitled to preferred claim.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the bankruptcy of Louis M. Kardos, Jr., and John Burke, individually

and as copartners, composing the firm of Kardos & Burke, in which L. Barton Case was trustee. Katherine Wilson, Howard O. Crusey, and Alice R. Ablett filed claims. From portions of an order determining a so-called omnibus reclamation proceeding in the bankrupt estate of Kardos & Burke, Katherine Wilson, Alice R. Ablett, and the trustee appeal. Order modified.

See, also, 17 F.(2d) 706.

David W. Kahn, of New York City, for appellant Case.

McKerchner & Link, of New York City (Herman M. Pogul, of New York City, of counsel), for appellant and appellee Wilson.

Saul S. Myers, of New York City (Earl B. Barnes, of New York City, of counsel), for appellant Ablett.

Francis R. Holmes, of New York City, for Crusey.·

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. The bankrupts were stockbrokers doing business in New York. They did not trade directly on the New York Stock Exchange, but transacted their Stock Exchange business through certain Stock Exchange houses, among them Marks & Graham. They took orders from their customers to buy or sell securities listed on the New York Stock Exchange, and transmitted the orders to Marks & Graham (or other Stock Exchange firms), without the knowledge of the customer, and without disclosing the customer's identity to Marks & Graham. So far as the books of Marks & Graham showed, the bankrupts were marginal customers of that firm. When the failure of the bankrupts occurred, Marks & Graham were both short and long of a large volume of securities in the bankrupts' account, and thereafter proceeded to liquidate the account and turn over to the estate the surplus cash and securities remaining after the payment of the indebtedness owing to them.

## Claim of Katherine Wilson.

[1] This claimant delivered to the bankrupts on January 30, 1922, two bonds of the Tacajo Sugar Company, having a par value of $2,000. The bonds were deposited as margin for a trading account, which Miss Wilson proposed to open with Kardos & Burke. They at the same time gave to her a receipt, in the form commonly given to their margin customers, whereby they were authorized to repledge all securities held for the account of their customer for sums due thereon, or for any greater sums. On February 1st the bankrupts delivered these bonds to their brokers, Marks & Graham, by whom they were credited to the account of the bankrupts, which was a brokerage account for the buying and selling of securities.

On February 2, Miss Wilson began to buy and sell securities through the bankrupts, continuing these operations until February 23, when the bankruptcy occurred. Thereafter Marks & Graham liquidated their account with Kardos & Burke, and there remained over a surplus of cash and securities, which were surrendered to the receiver. In such surplus securities were contained the two Tacajo Sugar bonds, which had not been sold, because they had not a sufficient market.

The claimant filed a petition in the omnibus proceeding to recover her two bonds. The trustee in bankruptcy contended that they were subject to the burden of the loan of Marks & Graham to Kardos & Burke, on the ground that the claimant was in the same position as their other margin customers, and should, therefore, share in the proceeds of the loan with them; and the master so held. The District Court, however, reversed the master in respect to this claim, and found:

(a) That the bonds were converted by the bankrupts on February 1, 1922, when they put them up as additional collateral with Marks & Graham, because at that time the claimant had not begun to trade with Kardos & Burke, and the latter had no right to use her bonds as collateral prior thereto;

(b) That, in view of this conversion, the rights of Miss Wilson to the excess collateral turned back to the ·trustee in bankruptcy must be "determined from the standpoint of a wrongful and illegal use by the bankrupt of her property, as against an authorized use of the property of the other claimants";

(c) That in these circumstances she had a preferential claim to the redelivery of her bonds.

The District Judge added:

"The fact that the claimant herein actually traded with the bankrupts after the conversion, and at the time of the bankruptcy was indebted to them, does not change her status as a preferred claimant."

There can be no reasonable doubt that, when Kardos & Burke delivered the bonds to Marks & Graham, with whom they had a trading account, they did this to furnish additional collateral against which they might have a credit, and that such an act was an exercise of dominion over the bonds which brought about a conversion. It by no means follows, however, that the conversion in all

respects changed the relationship between the bankrupts and the claimant in respect to the bonds.

It has been held that, if a pledgee converts his pledge, he may still set off the pledgor's debt against the recovery. Gruman v. Smith, 81 N. Y. 25; Stearns v. Marsh, 4 Denio (N. Y.) 227, 47 Am. Dec. 248; Farrar v. Paine, 173 Mass. 58, 53 N. E. 146. And, in accordance with the same general reasoning, it was held in Donald v. Suckling, 1 Q. B. 585, and Halliday v. Holgate, 3 Ex. 299, that the conversion of a pledge by a pledgee would not enable the pledgor to maintain trover or detinue without tender of the amount of his debt. These decisions show that the lien was preserved in spite of the conversion, for, if it had not been, there could have been no set-off, as the debts were not mutual. We think it can make no difference whether a conversion occurs before a customer begins to trade or afterwards. If the pledge survives in the first case we can see no reason why the lien should not be attributed to whatever the res may be in the second case. The violation of the pledgee's duty is the same in either event, and ought to be attended by similar consequences.

The order of the District Court, in so far as it relates to these bonds, should therefore be reversed, and the report of the master confirmed.

### Claim of Howard O. Crusey.

This claimant is seeking to recover $1,-845.33, which Kardos & Burke had on deposit in the Equitable Trust Company of New York at the time of their bankruptcy, and is basing his claim upon evidence that he has traced the proceeds of sale of his securities into that bank account. The District Court allowed the claim, and the trustee in bankruptcy appealed.

Crusey gave orders to the bankrupts to sell 10 shares of Tennessee Coal & Iron and 15 shares of Pullman Company stock, and to purchase 15 shares of the stock of the American Telephone & Telegraph Company. The first selling order, given on February 3, 1922, was for 10 shares of Pullman, and the second, given on February 5, was for 5 shares of Pullman and 10 shares of Tennessee Coal & Iron. Crusey apparently did not deliver the certificates for these stocks to Kardos & Burke until February 8, for that is the date of the receipt (page 71).

The 15 shares of Pullman Company stock were sold on the Consolidated Exchange, the first 10 on February 4, and the remaining 5 on February 6, to a broker named McHie,

and the 10 shares of Tennessee Copper were sold on February 6 to a Consolidated Exchange firm named Eichle. The accountant, Bernard Reis, testified that there was no delivery against these sales according to the books of the bankrupts (folio 128). He also testified that their books contained "so-called personal trading accounts," and that "stock was purchased and sold in the trading accounts for the purpose of reducing the number of shares Kardos & Burke had to carry for their customers."

[2] The proof indicates that these sales, for which statements were rendered to Crusey, were either matched against purchases for a "house account," or offset against some other purchaser that day. The former transaction would be a nullity (In re Wettengel [C. C. A.] 238 F. 798), and the latter should have been followed by a credit of the proceeds of the sale to the account of Crusey with the bankrupts. No one has shown that Crusey got anything out of these mythical sales, except a confirmation slip. The inference that no real sales were made to McHie and Eichle is fortified by the fact that Crusey's certificates for Pullman and Tennessee Copper were in the possession of the bankrupts from February 8 until they sold them for their own account on February 9, although they had made no delivery to McHie or Eichle. The District Court held that enough was shown to establish that the sales were nullities, and we are of the same opinion.

The certificates of stock which Crusey delivered for sale were turned over by Kardos & Burke to Marks & Graham about February 9, and sold for account of the former on that date. Marks & Graham thereupon transmitted their check for $8,283.18, which represented the difference between the purchases and sales on that day for account of Kardos & Burke, and included the proceeds of the sales of the Pullman and Tennessee Copper stocks, amounting to $1,845.33. The check was deposited in the account of Kardos & Burke with the Equitable Trust Company and the balances in that account between the date of the deposit and the date of bankruptcy were never less than the amount of Crusey's claim. This sum of $1,845.33 was credited by the bankrupts to account No. 700, which was one of their trading or so-called "house accounts." It was this sum which the claimant Crusey sought to reclaim in the omnibus proceeding.

It is contended on behalf of the bankrupt estate that, even if the sales to McHie and Eichle were nullities, and those through Marks & Graham were therefore for account

of Crusey, yet this reclamation must fail, because Kardos & Burke were directed to sell the stocks in order to procure funds with which to purchase 15 shares of American Telephone & Telegraph stock, and they purchased such stock from a broker named Bellan.

But the American Telephone & Telegraph stock purporting to have been purchased on the Consolidated Exchange from Bellan was never received by Kardos & Burke. Reis, the accountant, testified that they did not receive stock to complete this purchase from "any broker or outsider"; that they had a number of trading accounts on their books, generally known as "numbered accounts"; that from time to time there were short sales of securities made in these accounts; and that the short sales tended to nullify the purchases. It is to be noted, also, that Crusey, who was not a margin trader and wanted his stock in his own possession, pressed Kardos & Burke to close matters, and complained of their long delay in making the purchase; also that, after February 15, when he had received the confirmation slip showing the purchase from Bellan, he sought unsuccessfully to get his certificate.

The inference from all this would seem to be that he failed to obtain the certificate because the Bellan order was matched and no such stock was available. Indeed, there is evidence that after the date of the purchase the bankrupts never had the proper number of shares to meet the requirements of their customers. On February 15 they are shown to have had customers long 1,211 shares of American Telephone & Telegraph stock, and only had "4 shares in the box, 10 failed to receive from other brokers, 30 at Marks & Graham, and 100 in the Boston box, total 154" (folio 203). In other words, they were short 1,057 shares. Reis testified that they did not take up the balance of securities which on the clearance sheet of February 15 they were long over the short sales, and that the difference between what was purchased according to the blotter entries and what was received was attributable to "sales in the numbered accounts" (folio 208). In fact they never received but 3 shares from the Consolidated Exchange between February 15 and the date of their failure on February 23, and on the latter date they were short 1,190 shares.

[3] It is true that, if the bankrupts had received the 15 shares of American Telephone & Telegraph stock and had afterwards converted them, it would have been necessary to trace the proceeds in order to reclaim anything. In re A. O. Brown (C. C. A.) 175 F. 769. But the reasonable inference from the evidence is that no purchase was ever consummated, and that the bankrupts never had any stock available to fill Crusey's order. Thus the very purpose and condition of the sale of his Pullman and Tennessee Coal shares was not fulfilled. Only to pay for such a purchase could the bankrupts use the proceeds of sale. In re Shapiro Bros. (D. C.) 298 F. 196, affirmed (C. C. A.) 298 F. 1021; In re Bolognesi (C. C. A.) 254 F. 770; People v. Meadows, 199 N. Y. 1, 92 N. E. 128. So, whether the sales through Marks & Graham be regarded as made under Crusey's order, or as a wrongful conversion, the proceeds were his in either event. In re Wettengel (C. .C. A.) 238 F. 798.

We hold that the alleged sales to McHie and Eichle and the purchase from Bellan were not in fulfillment of Crusey's orders, that Crusey may therefore rescind his contract for failure of performance, and may reclaim the proceeds of sale of his stock which have been traced into the account of Kardos & Burke with the Equitable Trust Company. Such a disposition of this claim was made by the District Court; and it is affirmed.

### Claim of Alice R. Ablett.

[4] This claimant seeks to recover $3,871.75, which is alleged to be the proceeds of a sale of her securities traced into the hands of the trustee in bankruptcy. The master awarded that sum to the claimant, but was overruled by the District Court, and claimant appealed.

On February 11, 1922, Miss Ablett directed the bankrupts to purchase 50 shares of the preferred stock of the Steel & Tube Company, and they purchased it on that day through Marks & Graham for $3,957.50. Miss Ablett sent the bankrupts her check for that amount to pay for the stock, which was duly credited to her account with them on February 14. They did not pay Marks & Graham, who were carrying this and other securities for their account, but had no Steel & Tube stock, other than the 50 shares purchased as the result of Miss Ablett's order to the bankrupts. The bankrupts' customers were, according to their books, long 100 shares of Steel & Tube stock, including the stock in question, but no one except Miss Ablett filed a claim to this Steel & Tube stock.

On February 14, Miss Ablett received an acknowledgment of her check from the bankrupts, with a statement that, as soon as the certificates were received, they would

be forwarded by registered mail. They were never forwarded, but Marks & Graham, in liquidating their account with the bankrupts, sold the 50 shares of Steel & Tube stock for $3,871.75, and turned over this and other cash and securities which survived the liquidation to the receiver in bankruptcy of Kardos & Burke. This claimant seeks to recover the proceeds of the stock in the omnibus proceeding. The master decided that she had the right to the proceeds, but was overruled by the District Court, on the ground that the bankrupts never acquired control or dominion over the stock, never converted it, and hence the claimant stood in no different position from other customers, whose stocks were lawfully repledged, and must contribute her share of the burden of the loan. So the claimant, instead of recovering in accordance with the report of the master the sum of $4,024.47, which was the aggregate of the proceeds of the Steel & Tube stock and certain other securities held by the bankrupts for her account, had her claim, as finally allowed, reduced to $359.41, because she was compelled to share in the burden of the loan.

The trustee relies on the decision of In re Green (C. C. A.) 11 F.(2d) 676. There the brokers had lawfully hypothecated their customer's stock with his consent. The customer closed his account the day before a petition in bankruptcy was filed against his brokers, by directing the sale of enough of his securities to pay his debit balance. After this was done, he demanded the balance due him, together with the remaining collateral. The brokers paid him part of the balance, and delivered to him some of his securities, but failed to deliver the remainder, because they were financially unable to take them out of the pledge. Their pledgee closed out the loan and delivered the surplus to the trustee. The customer was denied priority over other marginal customers, who had not closed out their accounts prior to the bankruptcy, on the ground that the original hypothecation was lawful, and the failure to return the collateral was not a conversion, since it was not an act of commission, and did not amount to an assertion of dominion over the stock, but was due solely to a financial inability to redeem the stock. This court said (at page 677):

"If, having the power to redeem, he without warrant refuses to exercise it, it may be argued, though we do not suggest properly argued, that that failure to act would be evidence of a positive assertion of dominion. But when he becomes incapable of acting, no matter how, there can be no such

inference. From this it is apparent that the broker's wrong is wholly contractual, only a breach of his promise to redeem. It is quite true, as is said in Lawrence v. Maxwell, 53 N. Y. 19, that he repledges the collateral at his peril; but the peril is that he will not be able to perform what he has agreed to do. His failure cannot retroactively make unlawful his last positive and lawful act, except by a patent fiction. The customer has suffered the hazard which he originally accepted, the chance that the broker might fail in his" original "engagements. That is a wrong that all creditors" might "equally suffer; it does not arise from any act of commission."

Thus it appears that a situation like the present was carefully excepted from the scope of In re Green, supra. Here Marks & Graham were not simply creditors of the bankrupt, with a lien upon the Steel & Tube shares, but were also agents for them, holding the shares subject, of course, to a lien for their account. As between Miss Ablett and the bankrupts, the latter had no lien, for they had been paid in full. Nevertheless they continued to allow this stock to be used as part of their available collateral with Marks & Graham, although it had been arranged between the claimant and themselves that they should turn over the certificates to her appointees, and she had given them the money to do this specific thing. This use they continued to make long after any right they had to hypothecate the stock had terminated. Indeed, they got the claimants to pay for the shares the very day the certificates appear to have been delivered to Marks & Graham, so that upon no possible theory was their use of claimant's stock as collateral to their loan due to compulsion or necessity.

It can hardly be thought that the conversion by Kardos & Burke of Miss Ablett's check, and their wrongful neglect to take up her stock, was a "hazard which [she] originally accepted," or "a wrong that all creditors might equally suffer." Even though it be admitted, as was said in Green's Case, that "all the complex doctrines which have grown up about the subject presuppose victims of a conversion," yet the whole classification of rights of reclaiming creditors is the creation of Courts of Equity. These courts have placed claimants who have paid for their securities in full in a favored class, and have preferred them to ordinary margin traders in the marshaling of assets.

It may not at first be easy to see why outright owners should have been treated so much better by the courts than margin traders having valuable equities in securities,

since the broker who without special authority repledged the securities of margin customers beyond the amount of his own lien was as guilty of a conversion as though he had pledged the securities of customers who had paid in full. Yet it must have been realized that there was scarcely an active brokerage house, however honest, where the stocks of margin traders were not customarily carried in the blanket loans of the house, and that any other method of conducting business was widely regarded as impracticable. These considerations doubtless subconsciously affected the courts, and moved them to regard margin traders as having in fact accepted the almost inevitable hazards of a rehypothecation of their securities beyond the amount of their own indebtedness, and as having assumed the same status which traders in recent years have commonly agreed to in writing.

But, whatever be the reason, it is settled that securities on which there is no indebtedness are in a broad sense to be given a priority over the securities of margin traders.

In such circumstances, the absence of a technical conversion ought not to determine this claimant's rights. There was a deliberate wrong on the part of Kardos & Burke in failing to take up Miss Ablett's stock, for which an action in tort on the case could have been brought. Howe v. Cook, 21 Wend. (N. Y.) 29; Church v. Mumford, 11 Johns. (N. Y.) 479; Boorman v. Brown, 3 Q. B. 11; Crosby v. Plummer, 111 Me. 355, 89 A. 345; Nirdlinger v. American Dist. Tel. Co., 240 Pa. 571, 88 A. 6. This, we think, as fully as a conversion, puts Miss Ablett in a favored class. Her intention was to buy the Steel & Tube shares outright; her check was sent to the bankrupts the same day that Stock Exchange deliveries are ordinarily made where a holiday (in this case, Lincoln's Birthday, celebrated Monday, February 13) intervenes between the date of the purchase and the time for the delivery of the certificates.

To require a purchaser to pay in advance, in order to secure the status of an outright owner and to have priority over the ordinary margin trader, would seem to involve exactions hardly consonant with expectation or with customary business practice. Such a requirement, moreover, is beyond the implications of In re Green, supra, and seems contrary to the whole spirit of In re Ennis (C. C. A.) 187 F. 720, if not to its terms. The rights of class A and class B creditors, as was said by Judge Noyes in the latter case, "cannot always be measured by a hard and fast rule." See, also, In re Lauzier-Wolcott

& Co. (C. C. A.) 20 F.(2d) 591. A distinction between a pledge initially wrongful, and one which has ceased to be rightful, we regard as untenable.

The report of the master is confirmed, and the rights of the claimant are adjusted, so as to allow her priority as to the proceeds of the Steel & Tube shares.

The order as to all three claimants is modified in accordance with this opinion.