SEXTON v. AMERICAN TRUST CO. et al.

In re SAYLOR & WICHELMAN.

No. 8927.

Circuit Court of Appeals, Eighth Circuit.

Nov. 29, 1930.

Frank A. Cooper, of Davenport, Iowa (Thomas P. Sinnett, of Rock Island, Ill., on the brief), for appellant.

Herbert E. Sitz, of Davenport, Iowa (H. B. Betty, F. C. Harrison, Edmond M. Cook, Realff Ottesen, R. B. Swift, Albert F. Block, and Phillip Steffen, all of Davenport, Iowa, on the brief), for appellees.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

This is an appeal from an order in a bankruptcy proceeding approving and confirming the report of a special master denying appellant the right to recover in full the proceeds from the unlawful conversion by the bankrupt of certain Cities Service Company stock. Appellant's claim was allowed as a class A preferred claim for the full amount, but the fund available for the payment of claims is not sufficient to pay all the claims of said class. The bankrupt, Saylor & Wichelman, an Iowa corporation, was engaged in the stock and grain brokerage business. It handled its stocks through Chicago brokers, Jackson Bros., Boesel & Co., members of the New York Stock Exchange. The bankrupt kept in the hands or under the control of the Chicago brokers money and securities by way of margin in an amount equal to a stipulated per cent. of the par value of the securities ordered by bankrupt and bought or sold through the Chicago brokers. These brokers had nothing to do with the customers of bankrupt. When the bankrupt purchased for its customers stocks or securities through the Chicago brokers, the stocks were not delivered to the bankrupt unless paid for in full. They were carried by the brokers on the bankrupt's collateral account, and said brokers had the right to sell such stock to protect from loss. They would carry the same at the risk of bankrupt and

sell and account therefor on his order or deliver such stocks to the bankrupt, upon the payment in full. Bankrupt's customers dealt with the bankrupt in the usual way by ordering it to buy or sell short on margin, by putting up collateral security to cover any balances after partial payments or by ordering and paying for the stocks, or, as in the case of appellant, the bankrupt was to hold the stock after delivery to it until directed to sell. Confirmation slips of the usual form were issued showing the agreement between the bankrupt and the customers, which slips provided that the transactions were subject to the rules and customs of the New York Stock Exchange or the particular exchange where the transaction was carried on. The brokers reserved the right to close the contracts without notice or demand of payment when the account was insufficiently protected. If the customer desired the delivery of the certificate to the property ordered to be purchased it was obtained by the bankrupt through the Chicago brokers and delivered to the customer upon the payment of the purchase price and the commission. In short, bankrupt carried on the usual stock brokerage business in the usual and customary way, both with his customers and with the Chicago brokers, and all orders for the purchase or sale of the stocks here involved were made and carried out by the Chicago brokers, which fact bankrupt's customers in general knew. As the bankrupt approached its business crisis, it developed a habit of taking the securities of customers who had paid outright for them and ordered delivery, withholding the same from said customers, and wrongfully hypothecating them with its Chicago brokers for its own account. The books of the bankrupt kept prior to August 1, 1928, mysteriously disappeared before the hearing in the case, so that the books on hand disclosed only the condition of accounts subsequent to August 1, 1928. They did not show the arrangement with the Chicago brokers, which, however, was supplied by said brokers. As a result of the dealings between the bankrupt and the Chicago brokers, a considerable amount of stocks had accumulated in the hands of said brokers to secure a large indebtedness owing by the bankrupt to them. On the eve of taking the benefit of the Bankruptcy Act, the bankrupt advised the Chicago brokers to close its account by filling the shorts and selling the longs, which said brokers did.

Bankrupt filed its voluntary petition in bankruptcy, and was adjudicated a bankrupt on September 24, 1928.

The trustee in bankruptcy filed a petition February 1, 1929, seeking to marshal the liens and claims of ownership on stocks and securities and funds in the hands of trustee, making a large number of parties defendants, and setting forth the situation as to bankrupt's stock transactions; that bankrupt on the morning of September 24, 1928, had ordered its Chicago brokers to buy and sell the necessary stocks, bonds, and securities, to even up all trades which it had with said brokers, and that said brokers carried out the orders and turned over to the trustee $31,165.21, being the balance left after such evening up process had been completed. Petitioner asked that each of said defendants be required to answer by a day certain, setting up his rights in the securities or the proceeds thereof. The court made such order and appointed a special master to hear and determine the validity of said claims and make findings thereon to the court. Notice was given the various claimants, and some sixty thereof filed their requests for priorities in the funds in the hands of trustee.

The master heard each claim and made a general finding of facts and conclusions of law applicable to all claims, and also special conclusions and recommendations as to each. The master pointed out the various methods of bankrupt's dealings with reference to stock—that some of bankrupt's customers had bought stock and paid for it in full; others had purchased stock on margin and had placed the same in the hands of the bankrupt to hold until directions were given; others had stock in the hands of the bankrupt for sale when it should reach a certain price. The master points out that ofttimes a certificate or evidence of property ordered to be purchased was not delivered to the customer but was held and made use of by bankrupt pledging the same with the Chicago brokers as security for the indebtedness due from it to said brokers; that the different customers who had purchased stocks could not show the certificate number or that certain stock was in their names, although the books of bankrupt after August 1, 1928, showed so much stock in some certain corporation as belonging to the customers. We quote from the master's report: "Saylor & Wichelman, however, not only pledged and hypothecated stocks bought on margin, but also pledged as security for the indebtedness due them to Jackson Bros., Boesel & Co., stocks placed in their hands to be held by them until or-

374

dered by customer to be sold. They also pledged and hypothecated stocks bought and paid for in full."

The master held that claimants whose stocks had been wrongfully pledged and sold had a superior equity in the fund to those whose stocks, bonds, or securities were rightfully pledged under marginal transactions. The former were placed in class A; the latter in class B. In this the master followed well-established law. In re Ennis et al. (C. C. A.) 187 F. 720; Wright v. Blank (C. C. A.) 20 F.(2d) 591; In re Kardos et al. (C. C. A.) 27 F.(2d) 690.

The questions at issue here do not involve marginal trading, though the master in his report discusses the same.

Appellant raises a number of questions in the assignments of error, to wit: (a) That the burden was upon claimants to file answer and set up their rights in said fund, and that some of the claimants only partially stated their rights; (b) that the master did not make a restatement of the customer's account in each particular case; and (c) that the master should have found that appellant, having traced and identified his precise stock and traced the proceeds into the fund now in question, had established a claim of the highest equity, and superior to the claims of appellees who did not specifically identify or trace the stock claimed by them or the proceeds thereof.

As to the first proposition we may say: It is not controverted that the burden was on appellees to trace their stock into the possession of the Chicago brokers at the time of the sales of said stocks by them. The master was careful to require that, "before claimants can recover under a theory that bankrupt converted their stocks to bankrupt's own use, it is necessary for claimants to identify the original stocks or trace them into other specific funds which came into Trustee's hands." Schuyler v. Littlefield, Trustee of Brown & Co., 232 U. S. 707, 34 S. Ct. 466, 58 L. Ed. 806.

The master found they had carried this burden under the theory that they were not required to trace their securities by certificate numbers, but that they had sufficiently made their case by showing that, in the broker's possession at the time of bankruptcy and the sale of the securities were securities of the same kind and amount rehypothecated by the bankrupt who had purchased the same for them. The soundness of this theory is hereinafter considered.

As to the assignment of error regarding failure of restatement by the master of the customer's accounts, the findings of the master show that he examined the books of the bankrupt subsequent to August 1, 1928, and before assigning creditors to their respective classes. Whether the evidence supported the master's findings is not before us. The trial court held that appellant had waived objections to the master's findings of fact by failing to request that the evidence be certified to the court for review. This was of course true. We are not in position therefore to review or pass on any question of evidence. The master's findings on the facts must be accepted as unimpeachable. Sheffield & Birmingham Coal, Iron & Ry. Co. v. Gordon, 151 U. S. 285, 14 S. Ct. 343, 38 L. Ed. 164.

All other questions here are subordinate to the one properly raised by a number of assignments of error, namely: Is appellant in a position to assert a superior claim of priority in the fund in question for the full value of his stock, by virtue of the fact that the same was positively identified by certificate numbers as being in the hands of the Chicago brokers just prior to said brokers closing out the stocks received from bankrupt, over other claimants whose shares are identified in the hands of the broker only by the fact that there was stock in the hands of the brokers of the same type, kind and character as the stock purchased by them through said bankrupt. We quote from the master's report on this subject:

"I find no cases overruling Duel v. Hollins, 241 U. S. 523, 36 S. Ct. 615, 60 L. Ed. 1143, so that all claimants classified herein as Class A preferred claimants, whose stock was wrongfully pledged with Jackson Bros., Boesel & Co., but who cannot trace their identical stock by certificate number up to the day of sale, should share equally their particular kind of stock in proportion to the amount of stock on hand with Jackson Bros., Boesel & Co. on the day of adjudication in bankruptcy, as compared to the amount of stock in that particular security, that they were entitled to.

"None of the claimants in this bankruptcy matter have been able to trace their identical funds as the proceeds of the sale of their stock in the hands of Jackson Bros., Boesel & Co. for the reason that all stock was sold at one time by Jackson Bros., Boesel & Co. and the funds surviving the liquidation of the indebtedness due from bankrupt to Jackson Bros., Boesel & Co. are in one fund. The question then arises as to the rights of each

of the Class A claimants to this fund. As heretofore shown, where the proceeds of stock is traced into a common fund, comingled with others' stocks whose stocks were wrongfully pledged, it becomes a general fund and all Class A claimants should be considered as tenants in common to such funds and each should contribute to each other in the proportion, that the amount of their claim, after reducing such claim, if necessary, because there was insufficient stock of their kind in the hands of Jackson Bros., Boesel & Co., bears to the total fund."

As to appellant's claim, the special findings of the master thereon in part are as follows:

"Claimant directed bankrupt to hold this stock on his account and to send the stock to New York so that when it reached a price that claimant thought was sufficient claimant could sell such stock quickly and without delay and so receive the price that he wished to get for such stock. The bankrupt agreed to this arrangement. Bankrupt understood and agreed that they would keep the stock until claimant authorized them to sell the same. Claimant at no time directed or authorized bankrupt to sell, pledge, or rehypothecate said stock. Bankrupt without claimant's knowledge or consent, pledged and rehypothecated said stock with Jackson Bros., Boesel & Co., bankrupt's claimants in Chicago, as security for an indebtedness owing from bankrupt to Jackson Bros., Boesel & Co. and the claimant at no time authorized the bankrupt to sell said stock or to pledge said stock up to the time of bankruptcy.
*    *    *

"When Jackson Bros., Boesel & Co. learned of the insolvency of bankrupt they sold the various stocks, bonds and securities they had on hand in the account of Saylor & Wichelman, bankrupt, to liquidate the indebtedness due from bankrupt to Jackson Bros., Boesel & Co. and they had on hand the identical 359 shares of Cities Service stock that claimant had deposited with bankrupt and claimant can identify this stock by certificate number so there is no doubt but that it was the same stock that claimant deposited with bankrupt. Jackson Bros., Boesel & Co. sold 507 shares and 280/1,000 of Cities Service stock. Bankrupt violated its agreement with claimant by sending said Cities Service stock to Jackson Bros., Boesel & Co. as collateral instead of sending the same to New York as agreed. 359 shares of Cities Service stock sold as of the day of adjudication in bankruptcy for the sum of $24,286.66.

Forty shares of Mack Truck sold on the day of adjudication in bankruptcy for the sum of $3680.40. After adding all items of credit and deducting all debits for the sale of all stocks, etc., bankrupt owed claimant the sum of $25,201.03."

And, under the conclusions, the master states: "Claimant can also trace his identical stock into the hands of Jackson Bros., Boesel & Co. and in turn into the monies now on hand with the Trustee after Jackson Bros., Boesel & Co. sold this identical stock on the day of adjudication in bankruptcy of bankrupt. Claimant therefore should be classed as a Class A preferred creditor with reference to 359 shares of Cities Service common stock of the value of $24,286.66."

It stands, therefore, as an established fact, that appellant's stock in the Cities Service Company was wrongfully turned over to the Chicago brokers, was sold by them with other stocks, and the proceeds of such stock have gone into the fund here in question.

Equity can of course under these circumstances pursue these proceeds. In re Ennis et al. (C. C. A.) 187 F. 720; Macy v. Roedenbeck (C. C. A.) 227 F. 346, L. R. A. 1916C, 12; Zenor v. McFarlin (C. C. A.) 238 F. 721.

Appellant's position is that he was the owner of this stock, that the bankrupt had no right to sell the same until authorized by him, that he never authorized him to sell, pledge, or rehypothecate the same, and that the rehypothecation of the same as security for bankrupt's indebtedness to the Chicago brokers and the sale thereof produced the same result as a larceny of his stock. His contention is set forth in his exceptions, Nos. 2 and 3 to the report of the master. Referring in exception 2 to the master's finding that, where customers cannot find their identical securities in the event there are securities of the same type and kind but not identified by certificate numbers, they are then treated as tenants in common to such securities, appellant states that the master should have found "that securities left with the bankrupt for safe-keeping was a bailment. The pledging or hypothecation thereof without right or authority was unlawful and a wrongful conversion. The pledgor was a wrong-doer from the outset, and it was a larceny of the securities. A claimant making such proof that this stock was left for safe-keeping and afterwards wrongfully pledged or hypothecated and thence having traced and identified such certificates into the hands of the pledgee and the sale thereof and the pro-

ceeds from said sale into the hands of the trustee is of the highest equity; and that the securities of the bankrupt and others of less equity should have been first sold to satisfy the pledge and that the claimant Sexton's stock or its proceeds should be paid over to him, undiminished, and as a priority and without contribution towards costs or claims of other defendants and claimants and that the trustee be ordered to pay claimant Twenty-four Thousand Two Hundred Eighty-six and 66/100 ($24,286.66) Dollars."

And the third exception is as follows: "That master in his said report, in determining the equities of the various claimants to the fund in question classified and fixed the equities of claimant Sexton who can and did specifically identify his certificate of stock by number and definite 'earmark' on the same basis and parity as other claimants who could and did only identify their certificate of stock by general identification, viz.: 'A presumption of fair dealing, plus the physical presence of some stock, in the absence of countervailing proof,' on the authority of Duel v. Hollins, 241 U. S. 523, 36 S. Ct. 615, 60 L. Ed. 1143, which presumptive identification is only good as against the Trustee. Whereas the master ought to have found that the claimant, Sexton, having traced and identified his particular stock by marks and numbers into the possession of bankrupt, thence by certificate marks and numbers into the hands of its pledgee, and thence the sale of the identical stock by certificate marks and numbers by the pledgee, and the proceeds thereof into possession of the Trustee, established a claim of precise property and should take precedence and priority over claimants relying upon general or presumptive identification."

What as to the position of the other claimants in class A seeking contributions?

We will not review the record of all these claims. They are of the same general character. We take a typical one as illustrative, to wit, that of Ruth Cline. She was not indebted to the bankrupt, and in September, 1928, the bankrupt purchased for her account ten shares of stock of the Standard Oil Company of New Jersey, which she paid for in cash, and by turning a credit balance in favor of her husband over to bankrupt, making the full purchase price. This stock the bankrupt pledged with its Chicago brokers for moneys due from bankrupt to said brokers. The brokers sold more than ten shares of Standard Oil Company stock at the time of the general sale of the stocks. This stock was not identified by claimant, either by name or number, and there was no showing that the stock held by the brokers in the account of bankrupt belonged to any particular person, except that it was held as security for the debt due from bankrupt to the Chicago brokers. The conclusion of the master on this claim was as follows: "The pledging of claimant's stock by bankrupt, with Jackson Bros. was wrongful for the reason that claimant has paid for said stock in full so that claimant should be considered as a Class A preferred creditor, inasmuch as it is not necessary to trace stock by its serial number as heretofore explained, and it is only necessary to trace stock or the proceeds of stock of the same kind and character and in the same corporation. Claimant should have a pro rata share of the monies surviving the liquidation of the loan from Jackson Bros. to bankrupt as heretofore explained, which money is now in the hands of the Trustee."

The Master has found that all claimants in class A have identified and traced their securities into the hands of the Chicago brokers, who sold the same, then liquidated the debt of the bankrupt to them, and turned the balance over to the trustee. Appellees, however, must rely upon a certain equitable doctrine of the presumption of restitution and physical presence of stock of the same kind— the doctrine of presumptive identification. The courts have held this to be sufficient in identification. If this theory is sound and is applicable here it would seem to make no difference in the ultimate result as to how identification was made, and there would be no priority to one who traces by one theory over one who traces by another. It would naturally seem that, where a party had absolutely traced his property into the hands of one who had secured it wrongfully and had disposed of it wrongfully, he would be entitled to the proceeds as against parties who were compelled to rely upon a presumption. But as to stocks the courts apparently hold that in equity identification of securities by certificates is not of controlling importance, that there are no earmarks on stock, and that certificates are but evidence of the ownership of stock.

If appellant had not traced his certificates by numbers, or if appellees had, the situation of both would be admittedly identical. All of these parties have been defrauded. The larceny of appellant's stock is a little more apparent on the face of things, but there is little difference in the net result where stock is stolen or where it is dissipated and lost. So in any way of viewing the situation we

recur to the real question, viz. the effectiveness of identification of shares of stock by certificate numbers as compared with identification under the doctrine of presumptive restitution plus physical presence of stock of the same kind or the "grain in the bin theory." The "grain in the bin" theory is limited to the same kind of stock. There could not be Cities Service stock and Chicago & Northwestern stock in the same bin any more than there could be wheat and oats in the same bin. In re A. O. Brown & Co. (D. C.) 171 F. 254. The question of claiming a superior equity to the proceeds of stock by one owner as against other owners of that particular kind of stock is not here, as the master found.

"As between the different claimants in this case who can trace their stock by certificate number and those who cannot trace by certificate number, there is no difficulty for the reason that there was sufficient stock in the hands of Jackson Bros., Boesel & Co., in any one stock to satisfy these claimants whose stocks were wrongfully pledged, and who can trace their stock by certificate number, according to the findings of fact that I have hereinafter made. Therefore, there is no conflict between those who can trace their stock by certificate number and those who cannot, because their rights to any particular stock are not conflicting, and where stock has been traced by certificate number, the claimant need not share as tenants in common with those that cannot trace by certificate number, there being sufficient stock to satisfy such claimant in the hands of Jackson Bros., Boesel & Co. on the day of adjudication in bankruptcy, and the rules laid down in the following cases apply."

We refer to a number of decisions which have some bearing on the question.

The leading one is Richardson, Trustee in Bankruptcy v. Shaw, 209 U. S. 365, 28 S. Ct. 512, 516, 52 L. Ed. 835, 14 Ann. Cas. 981. While it is a case dealing with margins, it is important in that it holds a certificate of stock is merely evidence of the property in the shares of stock. We quote from this opinion:

"It is objected to this view of the relation of customer and broker that the broker was not obliged to return the very stocks pledged, but might substitute other certificates for those received by him, and that this is inconsistent with ownership on the part of the customer, and shows a proprietary interest of the broker in the shares; but this contention loses sight of the fact that the certificate of shares of stock is not the property itself, it is but the evidence of property in the shares. The certificate, as the term implies, but certifies the ownership of the property and rights in the corporation represented by the number of shares named.

"A certificate of the same number of shares, although printed upon different paper and bearing a different number, represents precisely the same kind and value of property as does another certificate for a like number of shares of stock in the same corporation. It is a misconception of the nature of the certificate to say that a return of a different certificate or the right to substitute one certificate for another is a material change in the property right held by the broker for the customer."

The concurring opinion of Justice Holmes is interesting. He states: "If I had been left to decide this case alone I should have adhered to the opinion which, upon authority and conviction, I helped to enforce in another place. I have submitted a memorandum of the reasons that prevailed in my mind to my brethren, and, as it has not convinced them, I presume that I am wrong. I suppose that it is possible to say that, after a purchase of stock is announced to a customer, he becomes an equitable tenant in common of all the stock of that kind in the broker's hands; that the broker's powers of disposition, extensive as they are, are subject to the duty to keep stock enough on hand to satisfy his customers' claims; and that the nature of the stock identifies the fund as fully as a grain elevator identifies the grain for which receipts are out. It would seem to follow that the customer would have a right to demand his stock of the trustee himself, as well as to receive it from the bankrupt, on paying whatever remained to be paid."

It was held that the return to the customer of another certificate of stock than the one left with the broker by the customer was not a preference, on the theory that one share of stock in a corporation is not different from any other share of the same issue, and the substitution of one certificate for another is not a material change in the property right. In the Richardson Case the court quotes with approval the statement of the Court of Appeals in New York in Caswell v. Putnam, 120 N. Y. 153, 157, 24 N. E. 287: "One share of stock is not different in kind or value from every other share of the same issue and company. They are unlike distinct articles of personal property which differ in kind and value, such as a horse, wagon, or harness.

The stock has no earmark which distinguishes one share from another, so as to give it any additional value or importance; like grain of a uniform quality, one bushel is of the same kind and value as another."

In Sexton v. Kessler, 225 U. S. 90, 98, 32 S. Ct. 657, 659, 56 L. Ed. 995, the same doctrine was followed as in Richardson v. Shaw, supra. The court refers to the fact that the broker is bound to keep stock enough to satisfy his contracts, and that, if it withdraw any of the securities, it is bound to substitute others of like kind, likening the situation to a grain bin, saying: "So, a depositor in a grain elevator may have a property in grain in a certain elevator, although the keeper is at liberty to mix his own or other grain with the deposit, and empty and refill the receptacle twenty times before making good his receipt to the depositor concerned."

Gorman v. Littlefield, 229 U. S. 19, 24, 25, 33 S. Ct. 690, 691, 57 L. Ed. 1047, is a case where the trustee of the bankrupt broker found in the estate certificates for shares of a particular stock legally subject to the demand of the customer for whom shares of that stock had been purchased by the bankrupt. It was held the customer was entitled to the same, although the certificates were not the identical ones purchased for him. The court said:

"It is therefore unnecessary for a customer, where shares of stock of the same kind are in the hands of a broker, being held to satisfy his claims, to be able to put his finger upon the identical certificates of stock purchased for him. It is enough that the broker has shares of the same kind which are legally subject to the demand of the customer. And in this respect the trustee in bankruptcy is in the same position as the broker. Richardson v. Shaw, supra.

"It is said, however, that the shares in this particular case are not so identified as to come within the rule. But it does appear that at the time of bankruptcy certificates were found in the bankrupt's possession in an amount greater than those which should have been on hand for this customer, and the significant fact is shown that no other customer claimed any right in those shares of stock. It was, as we have seen, the duty of the broker, if he sold the shares specifically purchased for the appellant, to buy others of like kind, and to keep on hand subject to the order of the customer certificates sufficient for the legitimate demands upon him. If he did this, the identification of particular certificates is unimportant."

The court held on the question of identifi-

cation that, as the certificates were on hand equal to the amount claimed by appellant and were not claimed by any other customer, there being no presumption the stock was stolen or embezzled, the general presumption of fair dealing should be followed, and that the broker had "supplied the deficiency for the benefit of his customer."

The last decision of the Supreme Court on the subject is Duel v. Hollins, 241 U. S. 523, 36 S. Ct. 615, 60 L. Ed. 1143. The District Court in Re H. B. Hollins & Co., 212 F. 317, 320, followed the doctrine of Gorman v. Littlefield, supra, and Richardson v. Shaw, supra, accepting the "grain in the bin" doctrine that it is unnecessary for a customer finding stock with his broker "to put his finger on the identical certificates purchased for him." The court refers to the "presumption in favor of fair dealing," and says, "Said presumption is productive of cynic smiles even in counsel advancing the same in courts nearer real life—as it is seen in stockbrokers' shops." This case was appealed to the Circuit Court of Appeals (219 F. 544), where it was reversed, the court following In re McIntyre & Co. (C. C. A.) 181 F. 960, and refusing to accept the theory of constructive identification based on presumptions of intent. This case reached the Supreme Court (Duel v. Hollins, 241 U. S. 523, 36 S. Ct. 615, 60 L. Ed. 1143), where the decision of the Circuit Court of Appeals was reversed, and the decision of the trial court was affirmed. The Supreme Court, page 527 of 241 U. S., 36 S. Ct. 615, 616, said: "In view of our former opinions it must be taken as settled: That bankrupts and their customer stood in the relation of pledgee and pledgor. That in their dealings stock certificates issued by same corporation lacked individuality, and, like fac simile storage receipts for gold coin, could properly be treated as indistinguishable tokens of identical values. That, as between themselves, after paying amount due brokers, the customer had a right to demand delivery of stocks purchased for his account; and such delivery might have been made during insolvency without creating a preference." It quotes liberally from Richardson v. Shaw, supra, approves the same, and points out that it is unnecessary for a customer, where shares of stock of the same kind are in the hands of a broker, to put his finger upon identical certificates of stock purchased for him. It emphasizes the fact that no other customer claimed any right in the shares of stock, and reaffirms the rule that, where the broker's bin contained certificates of stock in excess of those claimed by the cus-

tomer, no particular identification is essential if there be no other claimants to the stock.

In the Matter of Elmore and Duryee, Bankrupts, in the Supreme Court of the District of Columbia, 1 A. B. R. (N. S.) we quote from page 385: "It will be found that the courts have abrogated their former requirements of 'certificate identification' and have fully accepted the 'Grain-in-the-Bin' doctrine in the tracing of stocks, so that the presumption of restitution plus the physical presence of some stock of the same kind, supplies the lack of positive identification, and it is no longer necessary for a customer 'to be able to put his finger upon the identical certificates of stock purchased for him.' In other words, the courts only require identification of shares, not certificates." See, also, Skiff v. Stoddard, 63 Conn. 216, 28 A. 104, 21 L. R. A. 102.

The Circuit Court of Appeals (Second Circuit) in Re Pierson et al., 233 F. 519, 521, held that the rule of Gorman v. Littlefield, supra, was not restricted to stock "actually in the box on the day of the failure," that, if the stock were in some other box it would be the same, and says: "The rationale of the decision is that if the receiver has enough, or more than enough, of the particular stock to cover all customers who were long on the day of the failure, then the presumption that he intended to keep their stock on hand is a sufficient identification of the stock, or of so much of it as is needed, as theirs. If, however, the stock on hand, though sufficient to cover all actual claims, is not sufficient to cover all the long customers, no such presumption arises."

In United States & Mexican Trust Co. et al. v. Kansas City, M. & O. Ry. Co. et al. (D. C.) 240 F. 511, there were bonds incapable of definite identification by serial numbers, except that they were shown to be a portion of a large number of bonds pledged by the railway company in the purchase of equipment. Claimants were unable to specifically identify the bonds by serial number. No one else claimed to own them save the trustee in bankruptcy. The court held that further identification than that they formed a part of the mass of bonds pledged by the railway company was not indispensable to recovery by the true owners, relying on Richardson v. Shaw, and Gorman v. Littlefield and Duel v. Hollins, supra. See, also, Harmon v. Sprague et al. (C. C. A.) 163 F. 486; In re P. J. Sullivan Co., Inc. (D. C.) 247 F. 139; In re B. Solomon & Co. (C. C. A.) 268 F. 108.

While most of these cases are contests between the trustee and the claimants, and some are cases where margins are involved, the principles enunciated would seem to apply to a contest between claimants for priority, and to sustain the doctrine that the identification required is an "identification of shares, not certificates," and that the certificate is not the property itself.

Appellant relies on In re Wilson & Co., 252 F. 631, a District Court case, where the opinion by Judge Mayer, is most complete. In this case the court refers to the doctrine of Gorman v. Littlefield and Duel v. Hollins, supra, with evident approval that, where the claimant finds his security in kind, "he is entitled to that specific security or its equivalent, or his pro rata share, as the case may be," and that he must show that the proceeds of the conversion if there has been one have gone into the same particular fund, and trace his security in kind into that fund. The language of In re Wilson, which would seem to give a preference to a situation such as presented by appellant, applies to shares of a certain kind of stock. The court says, page 653 of 252 F., "Where, by reason of conversion, less shares of a certain stock are found 'in the box' than are necessary to satisfy the claims of 'long' customers, the procedure is first to trace. If a claimant identifies his stock by certificate number, etc., he is entitled to reclaim that stock or its proceeds. After such specifically identified shares are withdrawn from the total of shares, the remaining claims will be prorated under Duel v. Hollins, supra. After the proper pro rata has been assigned to each claimant who has successfully traced, then the equities of the claimant will be considered, in order to determine whether the claim falls under class A or class B."

In a contest between claimants as to a particular kind of stock, if a claimant identifies his stock, as Sexton does here, by certain numbers, he would be entitled to a preference over the owners of the same kind of stock in any particular class who could not make such identification. That is the sum and substance we think of the point urged in Re Wilson, supra.

The case of Johnson v. Bixby et al. (C. C. A.) 252 F. 103, 1 A. L. R. 660, is not on all fours with this case. In that there was piecemeal disposition of the securities pledged. The court does not seem to have considered the relative rights of customers equally situated and seeking priorities. Here the securities were all treated as one and sold at one time. It does not deal with the ques-

tion of tracing stock nor with classification of stock, but it does deal with the question of contribution between claimants of the same class. We think the case distinguishable from the present one. Appellant contends that, if the proof by presumptive identification permits appellees to be placed on a par with him and to recover on a pro rata basis, they have not brought themselves within the rules of Gorman v. Littlefield and Duel v. Hollins, supra, in that three things are necessary and some are here wanting:

"1. The existence of the stock on hand.

"2. No one else claiming.

"3. Presumption of fair dealing and the absence of countervailing proof."

The existence of the stock on hand is shown. As the master found there were enough shares left in the Cities Service stock bin to satisfy the other claimants thereto, it cannot well be urged that Sexton was claiming any of appellees' stock. Of course, in the light of this record, the presumption of any fair dealing on part of bankrupt must be received with "cynic smiles" and yet may be sufficient as part of a theory in stockbroker bankruptcy cases where the search for any equities is ofttimes barren of results.

The only thing in this case urged to make the equities of appellant superior to those of appellees is the identification by numbers of the certificates of appellant's stock. A part of the stock of all of these claimants went to pay debts of the bankrupt. There is no part of the money in the fund that represents the proceeds of the sale of appellant's stock any more than it represents the proceeds of the sale of similar kinds of appellees' stocks. Some of the cases go to the extent of holding that, if the stock of one is sold by a pledgee while that of the other survives, the equality is not even disturbed by that, and there should be contribution. In re Toole et al. (C. C. A.) 274 F. 337.

The situation here presented, where a pledgee has violated his duty to pledgors, is one demanding for a just and equitable solution the application of the doctrine of equitable contribution which, as Story has pointed out in Equity Jurisprudence, vol. 1, § 490, is founded on fundamental law, and, as stated in Re Cawley (D. C.) 29 F.(2d) 593, 595, rests on principles "of fundamental justice and equity." It assists in fair and just division of losses and prevents unfairness and injustice. We conclude, under the authority of the courts' decisions, hereinbefore referred to, and general equitable principles, that the identification by appellant of his stocks by certificate numbers gave him no priority over the claimants who purchased their stocks through bankrupt, paid for them in full, and found stocks of the same kind and character in the hands of the brokers unclaimed by others, and which stocks were sold by the brokers in the general clean-up sale, the proceeds of which went into a common fund and were there comingled with the proceeds of the sale of appellant's stock; said common fund now being in the hands of the trustee in bankruptcy.

The order and decree of the trial court is affirmed.