**AMERICAN EMPLOYERS' INSURANCE COMPANY, a Massachusetts corporation, Appellant,**

**v.**

**MARYLAND CASUALTY COMPANY, a Maryland corporation, Appellee.**

**No. 6878.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 20, 1954.

Decided Dec. 30, 1954.

John L. Abbot, Lynchburg, Va., for appellant.

Claude E. Taylor, Jr., Martinsville, Va. (Joyce & Stone, Martinsville, Va., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Maryland Casualty Company brought this suit against American Employers' Insurance Company to recover the sum of $11,250 as a contribution toward the sum of $26,750 which Maryland Casualty has paid in satisfaction of several judgments obtained against James Henry Arrington, W. E. Frye and Tyler Fountain by or on behalf of certain persons who were killed or injured on June 4, 1951 in Henry County, Virginia, in a collision between several vehicles including an automobile driven by Arrington, an employee of Frye, and an automobile driven by Fountain. At the time of the collision there were outstanding an automobile liability policy issued to Fountain by American Employers' and also an automobile liability policy issued to Frye by Maryland Casualty,

and the basis of the claim in suit was that Maryland Casualty, having paid the judgments as the insurer of Frye, was entitled to contribution from American Employers', the insurer of Fountain, to the extent of one-half of the money paid by Maryland Casualty in satisfaction of the judgments. The claim was reduced to the sum of $11,250 because of limitations of liability in the policy issued by American Employers'. Judgment for that amount was given in the District Court.

The policy issued by American Employers' to Fountain covered a 1937 Chevrolet Coupe owned by him. Included in the definition of the term "automobile" in the policy was a provision for the extension of the coverage to a "Temporary Substitute Automobile"—not owned by the insured —while temporarily used as a substitute for the described automobile while withdrawn from normal use because of its breakdown, repair, service, loss or destruction. At the time of the accident Fountain was driving a Ford automobile owned by his wife, and an important question at issue is whether this car was a temporary substitute automobile within the meaning of this provision. The car owned by Frye and driven by his employee Arrington in the collision was a Fruehauf tractor-trailer which was covered by the policy issued by the Maryland Casualty Company.

The defense most earnestly urged by American Employers' in the District Court was that the policy issued to Fountain did not cover the vehicle driven by him at the time of the accident. Considerable testimony was taken on this issue and after careful consideration, the District Judge rejected the defense. The car described in Fountain's policy was acquired by him in a trade, in which Fountain received the car and $100, and gave in exchange a 1940 Chevrolet. When the trade was made the coupe was not in satisfactory running condition and it was towed to a small garage at which Fountain from time to time repaired cars. Thereafter Fountain and an associate endeavored to repair or put the car in condition without success. The appellant contends that during the whole period between the acquisition of the car in August, 1950 and the accident on June 4, 1951 the car was not in condition for use and that therefore the Ford car, driven by Fountain at the time of the accident, could not be considered as a temporary substitute. During this period, however, Fountain paid for the insurance policy issued by the American Employers' covering the car, drove it to some extent on back roads, and used his skill and experience in the repair of cars in an endeavor to recondition it. He tried to fit it with a new engine so that it would be serviceable and finally sent it away to a service station and garage to be repaired. In the meantime his wife was in possession of the Ford car which she had purchased for her own use in going to and from her work ten miles distant from the Fountain home. When she was not using her car, Fountain occasionally used it on business of his own; but the use was occasional and not regular. Usually he was able to go to his work at a saw mill in a lumber truck of the mill.

On the other hand, there was evidence tending to show that Fountain had no license on the car in 1950 or 1951 when he owned and was trying to repair it; and there was some reason to believe that he took out the insurance policy so as to be able to retain a driver's license, which he would have lost because of a previous accident, if he had not taken out the American Employers' policy under the Virginia Motor Vehicle Safety Responsibility Act, Code 1950, § 46–386 et seq. There was also evidence tending to show that before the accident he had given up any real attempt to repair the car and had sold it to another person who bought it for salvage purposes, and ultimately sold it for junk.

Since this defense was vigorously pressed by the defendant in the District Court, the District Judge gave it most careful attention in his opinion. He did not credit the testimony that Fountain had sold the car before the accident and he found that Fountain had been able to run the car with difficulty to a limited extent after acquiring it, that he had made a bona fide effort to repair it, and put it in condition himself, and had ultimately sent it to a garage to be repaired about six weeks before the accident, although there was some indication that it might have been out of his hands for a longer period. Upon all the testimony the judge reached the conclusion that the car was owned by Fountain and was under repair on June 4, 1951, the day of the accident, and that on that day as on other occasions Fountain was using his wife's car on an errand of his own.

■ In short, the judge found that Fountain used his wife's car as a substitute for his own because the latter was under repair and not susceptible of normal use, and he rejected the contention that the car described in the policy had been given up or abandoned as a usable car or sold. It was not an easy decision to make since the evidence at certain points was indefinite and conflicting, but it presented a situation that could only be satisfactorily resolved by the trial court, and we find no reason to disturb the court's findings on this appeal. See Fleckenstein v. Citizens' Mutual Automobile Ins. Co., 326 Mich. 591, 40 N.W.2d 733; cf. Western Casualty & Surety Co. v. Norman, 5 Cir., 197 F.2d 67.

■ It is also contended that even if Fountain's policy covered the car he was driving at the time of the collision, Maryland Casualty is not entitled to contribution from American Employers' because this would permit the former to recover under a contract of indemnity to which it was not a party and for whose benefit it was not made.

We cannot accept this argument. The doctrine of contribution does not rest upon contract but upon general principles of equity and natural justice; and the right arises when one has been compelled to pay more than his share of a common obligation which several persons are bound to discharge.

■ In Virginia the common law restriction upon contribution among joint tort-feasors has been modified by a statute which provides that contribution among wrongdoers may be enforced when the wrong is a mere act of negligence and involves no moral turpitude. Code of Virginia, § 8–627. The Supreme Court of Virginia has held that under this statute not only a joint tort-feasor but also his insurer, who has paid a judgment against him and another joint tort-feasor, has the right of contribution from the latter. In McKay v. Citizens Rapid Transit Co., 190 Va. 851, 859, 59 S.E.2d 121, 124, 20 A.L.R.2d 918, the court said:

"It is contended that our statute dealing with contribution between joint tort-feasors confers only a personal right to which the insurance companies cannot be subrogated, and that they were not joint tort-feasors. The Virginia statute allowing contribution among joint tort-feasors does not by its terms forbid subrogation to an insurer of a tort-feasor, nor does it in any way indicate that there is anything personal in the right of contribution conferred. In Virginia subrogation is allowed to nearly every right and there appears to be no sound reason for refusing its application to the right of contribution. * * * 'Virginia has long been committed to a liberal application of the principle of subrogation. * * * "In no other jurisdiction has the doctrine been more firmly adhered to, or more liberally expounded and applied, to meet the exigencies of particular cases, than in Virginia." '

"Unless the statute allowing contribution could be invoked in cases like the one at bar very unjust situations would result. There would be placed in the hands of the plaintiff in the original judgment action sole control over the right of contribution of the joint tort-feasor. If the plaintiff saw fit to make a joint tort-feasor a party defendant to the original judgment action then contribution would be allowed to another joint tort-feasor, but if arbitrarily the plaintiff in the original judgment action decided to make only one joint tort-feasor a party to the judgment action the other joint tort-feasor might be powerless to do so, and however joint the negligence might be, would be deprived of his right to contribution."

Evidently, the Virginia court favors liberality in the application of the doctrine of contribution as well as the doctrine of subrogation, recognizing that both doctrines have their basis in the same broad principles of equity, since the court extends the right to the insurer on the ground that the statute does not forbid it. In this respect its interpretation differs from that placed in the Supreme Court of North Carolina on a somewhat similar statute of that state in Gaffney v. Lumbermen's Mut. Casualty Co., 209 N.C. 515, 184 S.E. 46, and Lumbermen's Mut. Casualty Co. v. United States Fidelity & Guaranty Co., 211 N.C. 13, 188 S.E. 634, where the court held that an insurer of one joint tort-feasor is not entitled to contribution from the insurer of another joint tort-feasor, because the statute mentions only joint tort-feasors and joint judgment debtors and hence even a most liberal construction would not permit the reading into the statute of the insurance carriers of tort-feasors.

It does not appear that the Virginia court has as yet considered the specific question now before us, that is, whether the insurer of one joint tort-feasor may have contribution not only from the other joint tort-feasor, but also from the latter's insurance carrier; but this additional step would in our opinion be in harmony with the policy of the Virginia law. There are only a few decisions on the point; but in three jurisdictions the right has been upheld under varying circumstances. See Commercial Casualty Ins. Co. v. Capital City Surety Co., 224 App.Div. 500, 231 N.Y.S. 169; Western Casualty & Surety Co. v. Milwaukee General Const. Co., 213 Wis. 302, 251 N.W. 491; and under the Louisiana Code, Gray v. Hartford Acc. & Ind. Co., D.C.La., 31 F.Supp. 299; Pucheu v. National Surety Corp., D.C.W.D.La., 87 F.Supp. 558. Cf. Tullgren v. Jasper, D.C.Md., 27 F.Supp. 413; Indemnity Ins. Co. of North America v. American Surety Co., 239 App.Div. 522, 268 N.Y.S. 203.

■ In our view the right to contribution between insurers in such cases may be based on the general principle of contribution which has been applied in a variety of circumstances. Thus it was held in Phillips-Jones Corp. v. Parmley, 302 U.S. 233, 58 S.Ct. 197, 82 L.Ed. 221, that a stockholder who has received his pro rata share of the corporate assets upon dissolution, and has been compelled as a transferree to pay income taxes owed by the corporation, is entitled to contribution from his co-stockholders; and in Vandiver & Co. v. Pollak, 107 Ala. 547, 19 So. 180, a creditor who with other creditors caused a sheriff to execute on the wrong property and paid a resulting liability, is entitled to contribution from the latter; and in Central Banking & Security Co. v. United States Fidelity & Guaranty Co., 73 W.Va. 197, 80 S.E. 121, 51 L.R.A.,N.S., 797, that when one of three insurers of the administrator of an estate pays for a default, the others must contribute according to the proportionate amount of the penalties of their bonds.

The recognition of the right of contribution seems especially significant in cases where securities belonging to different parties are entrusted to a stockbroker and are pledged by him as security for a loan and subsequently sold to satisfy the loan, in which circumstance it is held that the security holders whose securities were not sold must contribute proportionally to reimburse those whose securities were sold. In re Toole, 2 Cir., 274 F. 337; Sexton v. American Trust Co., 8 Cir., 45 F.2d 372, 76 A.L.R. 781; Asylum of St. Vincent de Paul v. McGuire, 239 N.Y. 375, at pages 381, 382, 146 N.E. 632, at page 634, 38 A.L.R. 1214. In the last mentioned case it was said:

"* * * In our opinion it makes no difference here that the process which ended in this result commenced with a criminal act or that there was no original relationship between the different owners and that the pledge of each lot of securities was a separate and distinct transaction. Armitage v. Pulver, 37 N.Y. 494; Robinson v. Boyd, 60 Ohio St. 57, 67, 53 N.E. 494; Chaffee v. Jones, 19 Pick., Mass., 260. The controlling circumstances are that, even though by wrongful and separate routes, the different lots of securities through the acts of a common pledgor reached the same destination where they were lodged in the possession of the same pledgee, validly pledged for the same debt and indisputably subjected to the same burden. That is the situation with which we start and with which we have to deal, and in dealing with it we must remember some of the well-settled principles which govern our consideration.

"The right to contribution here invoked is not dependent on contract or joint action or original relationship between the parties. It is based on principles of fundamental justice and equity. Wells v. Miller, 66 N.Y. 255; Cuyler v. Ensworth, 6 Paige, [N.Y.] 32. And of these principles no one is more explicit and outstanding than the one that, where the situation of parties is equal and one has borne more than his just share of the common burden, he is entitled to contribution from others who have been dealt with more fortunately."

We reach the same destination in the pending case. In most instances a potential right of contribution arises upon the assumption by several persons of a common obligation, but it is not essential that the obligation be assumed simultaneously. It is of no moment that in the pending case each of the insurance companies, which are parties hereto, independently of the other, issued a policy of automobile insurance covering the owner of a particular car for liability for injuries inflicted in the operation of the vehicle, and that there was no relationship between the insurers or between the policy holders at the time either policy was issued. The important circumstance is that an accident occurred involving both cars in which the drivers of both were at fault, so that each insured became immediately liable and the indemnity provisions of each policy became effective with respect to all the injuries incurred. Thereupon the two insurance companies became subject to a common obligation to the extent of the respective limits of their policies, and when one of them paid the total amount of the debt, the right to contribution from the other arose.

Affirmed.